IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | | |
|---|---|---|
| IN RE: | LANDAMERICA FINANCIAL GROUP, INC., et al., | Case No. 08-35994-KRH<br>Chapter 11<br>Jointly Administered |
| | Debtors. | |

_____

MILLARD REFRIGERATED SERVICES, INC.,

         Plaintiff,

v.                                               APN 08-03147-KRH

LANDAMERICA 1031 EXCHANGE SERVICES, INC.,

         Defendant.

_____

## <u>MEMORANDUM OPINION</u>

Before the Court are the cross-motions for partial summary judgment of Plaintiff Millard Refrigerated Services, Inc. ("Millard"), and of Interveners The Official Committee of Unsecured Creditors of LandAmerica Financial Group, Inc. (the "LFG Committee") and The Official Committee of Unsecured Creditors of LandAmerica 1031 Exchange Services, Inc. (the "LES Committee;" together with the LFG Committee, the "Committees"). The question presented by the cross motions is whether certain exchange funds deposited into a bank account of Defendant LandAmerica 1031 Exchange Services, Inc. ("LES" or the "Debtor") for the purpose of facilitating three like-kind exchange transactions constitute property of the bankruptcy estate of LES.[1] For the reasons set forth below, the Court answers this question in the affirmative.

_____

[1] LES has joined in the cross motions filed by the Committees.

This case is one of over 85 adversary proceedings that have been brought, so far, by former customers of LES in connection with its Chapter 11 bankruptcy case. Each of these former customers asserts that money deposited into the bank accounts of LES to facilitate like-kind exchanges was held in trust for its benefit and should be returned to it. As of the Petition Date, the Debtor had approximately 450 uncompleted exchange transactions. Each of these uncompleted exchange transactions was governed by a separate exchange agreement executed by LES and its former customer.

The Debtor identified two primary types of exchange agreements that LES utilized in the course of its operations: (a) agreements that included language contemplating that the applicable exchange funds would be placed into an account or sub-account associated with the relevant customer's name (the "Segregated Account Agreements"); and (b) agreements that did not include this "segregation" language (the "Commingled Account Agreements"). Approximately 50 of the uncompleted exchange transactions involved Segregated Account Agreements while the remaining approximately 400 of the uncompleted exchange transactions involved Commingled Account Agreements.

The Court entered a protocol order on January 16, 2009, wherein the Court stayed the litigation in all but five of the over 85 adversary proceedings (the "Protocol Order"). Each of the five select cases, which were allowed to proceed on an expedited basis, presented legal and factual issues that were common to certain of the other adversary proceedings. Three of the select cases were representative of customers who had Commingled Account Agreements: those with type A agreements, those with type B agreements, and customers with hybrid agreements under which both cash and non-cash proceeds were transferred to LES. [2] Two of the select cases

---

[2] As defined by the parties, Commingled Type A Cases generally involve the wire transfer of exchange funds to a general LES account at SunTrust Bank; Commingled Type B Cases generally involve the deposit by LES of exchange funds into a LES account at SunTrust Bank. (Joint Motion of Debtor and LES Committee for Order

were representative of customers who had Segregated Account Agreements: customers with escrow account agreements and customers with segregated exchange agreements. The Millard adversary proceeding currently before the Court is the adversary proceeding selected to be the representative case for customers with segregated exchange agreements.

By Order entered February 10, 2009, the Court divided the litigation involving the five select cases into phases and limited the scope of the first phase to tracing of exchange funds, contractual interpretation of the exchange agreements, the existence of an express trust and the existence of a resulting trust. In the Millard adversary proceeding, the case presently before the Court, hearing was conducted on the cross motions for partial summary judgment on April 7, 2009, at which counsel for Millard, counsel for the LFG Committee, counsel for the LES Committee, and counsel for the Debtor all presented argument. Pursuant to the terms of the Court's Protocol Order, all of the parties to the stayed adversary proceedings were permitted to file amicus briefs advocating their respective positions in this case.

This Memorandum Opinion sets forth the Court's findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.[3] The Court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157(a) and 1334 and the General Order of Reference from the United States District Court for the Eastern District of Virginia dated August 15, 1984. This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (M)

---

Establishing Scheduling Protocol, ¶ 8.) Another distinction between Type A and Type B Cases can be found in Section 3(a) of the respective Exchange Agreements. The Type A agreements state that interest will be computed from the first business day following LES' receipt of funds in the account "it maintains at SunTrust Bank for the purpose of collecting taxpayers' exchange funds." The use of the plural possessive "taxpayers'" suggests that the funds of multiple customers are being deposited into the same SunTrust account. The Type B agreements state that interest will be computed after receipt "in an account maintained at SunTrust Bank" without reference to other "taxpayers." The hybrid agreements are otherwise Type B agreements.

[3] Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate. *See* Fed. R. Bankr. P. 7052.

and (O), in which final orders or judgments may be entered by a bankruptcy judge.  Venue is

appropriate in this Court pursuant to 28 U.S.C. § 1409(a).

**Issues Presented**

Millard contends that it is entitled to partial summary judgment with respect to Count I

(Declaratory Relief) and Count II (Injunctive Relief) of its Complaint against LES because its

exchange funds were held in three segregated sub-accounts of LES established and maintained

for the benefit of Millard.  Millard contends that the exchange funds held in the segregated

accounts are held in trust and, therefore, are not property of the Debtor pursuant to 11 U.S.C.

§ 541(d).  Thus, it argues that the exchange funds should be turned over to Millard in their

entirety, outside of the bankruptcy pro rata distribution system.

The Committees and the Debtor counter that the exchange funds were held by LES

pursuant to the terms of exchange agreements executed by Millard and LES.  The three exchange

agreements at issue here, they argue, set forth the complete agreement and understanding of the

parties plainly and unambiguously.   The Committees point out that under the terms and

provisions of the exchange agreements, Millard disclaimed all "right, title and interest" in and to

the exchange funds and provided LES with exclusive rights of "dominion, control and use" with

respect to the exchange funds.  From this they argue that it was the clear intention of the parties

not to create a trust arrangement.  The Committees and the Debtor assert that Millard vested LES

with full authority over the exchange funds and, in so doing, Millard transferred clearly more

than bare legal title to the exchange funds.  They conclude that the contractual relationship

established between Millard and LES was not one of trustee and beneficiary; rather, they assert

that the relationship was, and continues to be, one of debtor and creditor.  Thus, they argue that

while the Debtor may be contractually obligated to perform the exchange transactions on

Millard's behalf, its failure to do so would render it liable only for the breach of its contract and

4

under no other theory of liability.   They argue that Millard should receive the same pro rata

treatment as all of the other former exchange customers of LES.[4]

## Undisputed Facts

The material facts are not in dispute.   Millard is a Georgia corporation engaged in the

refrigerated warehouse and distribution business.   It maintains 35 locations throughout the

country.   LES is a wholly owned subsidiary of LandAmerica Financial Group, Inc. ("LFG").   On

November 24, 2008, LES ceased doing business as a qualified intermediary for like-kind

exchanges.   On November 26, 2008 (the "Petition Date"), LES filed, along with LFG, a petition

for relief under Chapter 11 of the United States Bankruptcy Code in this Court.   The LES

Committee and the LFG Committee both are statutory committees appointed in the respective

bankruptcy cases of LES and LFG.   The Committees were each granted leave to intervene in this

action.[5]

Prior to the Petition Date, LES was a qualified intermediary for like-kind exchanges

consummated by taxpayers pursuant to § 1031 of the Internal Revenue Code, 26 U.S.C. § 1031

("1031 Exchange").   A 1031 Exchange allows a taxpayer to defer the payment of tax that

otherwise would be due upon the realization of a gain on the disposition of business or

investment property.   *Id.*   In the typical transaction, an exchanger such as Millard assigns its

rights as seller under a purchase agreement for the disposition of business or investment property

---

[4]   In the ordinary course of its business, LES invested certain of the exchange funds it received from its former customers.   Some of the invested exchange funds received by LES are now held in the form of illiquid auction rate securities as a result of the unprecedented, rapid economic decline experienced in the latter part of 2008 that left the credit markets frozen.   As a consequence, LES does not have the ability from a liquidity standpoint to fund all of the exchanges it is contractually obligated to complete within the time parameters that § 1031 of the Internal Revenue Code requires.   To permit one group of exchangers to recover their exchange funds under a trust theory necessarily reduces the amount of liquid funds available for distribution to other exchange creditors and impacts all of the other exchange creditors adversely, whether similarly situated or otherwise.

[5]   *See* the January 6, 2009, Order granting the LES Committee's Motion to Intervene and the January 16, 2009, Notice of Intervention filed by the LFG Committee.

to a qualified intermediary such as LES.  The purchaser of the relinquished property transfers the net sales proceeds directly to the qualified intermediary.

Under § 1031, the exchanger must identify like-kind replacement property within 45 days.  The exchanger has 180 days to close on the replacement property.  *Id.*  The qualified intermediary purchases the replacement property and then transfers the replacement property to the exchanger.  In the event that the replacement property is not identified or the closing is not completed within the specified time periods, then the qualified intermediary pays an amount equal to the net sales proceeds it realized from the sale of the relinquished property to the exchanger.  This series of transactions is governed by a written exchange agreement executed by the exchanger and the qualified intermediary.[6]

Beginning in 1992, LES maintained a general, multipurpose checking account at SunTrust Bank, Inc. ("SunTrust").  This checking account was titled in LES' own name, bearing an account number with the last four digits "3318."  LES used this account as its general operating account.  The SunTrust account received cash (i) in the form of certain customers' exchange funds, (ii) in the form of service fees charged to customers, (iii) in the form of interest, and (iv) in the form of returns on LES' investment of the cash it received.  LES disbursed funds from the SunTrust account to pay its expenses, to pay dividends to LFG, to make investments in

---

[6]  The treasury regulations governing 1031 Exchanges make clear that the taxpayer must abrogate all control over the exchange funds until the exchange is completed.  "If the taxpayer actually or constructively receives money or property in the full amount of the consideration for the relinquished property before the taxpayer actually receives like-kind replacement property, the transaction will constitute a sale and not a deferred exchange, even though the taxpayer may ultimately receive like-kind replacement property."  Treas. Reg. § 1.1031 (k)-1(f).  However, the abrogation of control required by the treasury regulations does not require the taxpayer to relinquish all right, title and interest to the exchange funds as the parties to these Exchange Agreements (as hereinafter defined) contracted for Millard to do.  *See DeGroot v. Exchanged Titles, Inc. (In re Exchanged Titles, Inc.)*, 59 B.R. 303, 306 (Bankr. C.D. Cal. March 27, 1993) ("for the purpose of the exchange . . . there was no need for [the accommodator] to acquire 'real' interest in the . . . property . . . to make the exchange qualify under the statute. . . .'") (citation omitted); *Cook v. Garcia*, No. 96-55285 1997 WL 143827, at *1 (9th Cir. 1997) ("A taxpayer need not abandon all equitable interests in the proceeds . . . for a transaction to qualify as a non-taxable event under section 1031.").  This negates Millard's argument that the disclaimers contained in Section 2 of the Exchange Agreements were included only because the treasury regulations required them to be included.

other investment vehicles, and to purchase replacement property for customers who had not insisted that their exchange funds be deposited in segregated accounts.

LES used funds in the SunTrust account to invest in a variety of short-term investments, including money market mutual funds, short-term bonds, certificates of deposit, floating rate notes, and auction rate securities.[7]   The auction rate securities were held in a brokerage investment account at SmithBarney and SunTrust Robinson Humphrey.   Each evening, the aggregate cash balance in the SunTrust account was swept out into an LES overnight investment account and then returned to the SunTrust account the following morning.  The SunTrust account is referred to as the commingled account of LES (the "Commingled Account").

Treasury Regulation Section 1.468B-6, 26 C.F.R. § 1.468B-6,[8] establishes rules concerning the taxation of exchange funds held by exchange facilitators.   The default rule established by the treasury regulation is that where the exchange funds exceed $2 million, they will be treated for tax purposes as a loan from the taxpayer to the qualified intermediary.  Treas. Reg. § 1.468B-6(c)(1); Treas. Reg. § 1.7872-5(b)(16).   There are, however, four safe harbor exceptions to this default rule.   One of those safe harbors provides that if a qualified intermediary holds the exchange funds in a segregated account established under the taxpayer's name and identification number, then the qualified intermediary need not take into account items of income, deduction, and credit attributable to the exchange funds.   Treas. Reg. § 1.468B-6(c)(2)(i)-(ii).[9] Under this exception exchange funds held in sub-accounts are treated as separate accounts even though they may be linked to a master account.  Treas. Reg. § 1.468B-6(c)(2)(ii).

---

[7]  See note 4 *infra* regarding LES' investments in auction rate securities.

[8]  All subsequent references to Treasury Regulations may be found in Title 26 of the Code of Federal Regulations in correspondingly numbered sections.

[9]  Treas. Reg. § 1.468B-6(c)(2)(i)-(ii) provides:
    (2)    Exchange funds not treated as loaned to an exchange facilitator—

LES entered into an exchange management control account agreement with Citibank, N.A. ("Citibank") in August 2008. This management control account agreement permitted LES to open segregated client sub-accounts (the "Segregated Accounts") under one or more control accounts. Millard and LES entered into three substantially identical exchange agreements on October 21, 2008 (the "Exchange Agreements"), with LES acting as qualified intermediary. Previously, prior to 2006, Millard had successfully completed two 1031 Exchange transactions with a different qualified intermediary known as Apex Property Exchange, Inc. In connection with those earlier exchange transactions, Millard had specifically negotiated for the exchange funds to be held in segregated sub-accounts associated with Millard's name and taxpayer identification number. Consistent with those previous transactions, Millard discussed with LES the use of the Segregated Accounts for the 2008 1031 Exchange transactions; and ultimately, the parties agreed that the proceeds of the sales of Millard's Relinquished Properties would be placed in the Segregated Accounts maintained by LES at Citibank.[10]

Pursuant to the three Exchange Agreements dated October 21, 2008, Millard assigned to LES its rights as seller under purchase agreements for three separate properties (the

---

(i)    Scope.

This paragraph (c)(2) applies if, in accordance with an escrow agreement, trust agreement or exchange agreement, as applicable, all the earnings attributable to a taxpayer's exchange funds are paid to the taxpayer.

(ii)    Earnings attributable to the taxpayer's exchange funds—

(A)    Separately identified account. If an exchange facilitator holds all of the taxpayer's exchange funds in a separately identified account, the earnings credited to that account are deemed to be all the earnings attributable to the taxpayer's exchange funds for purposes of paragraph (c)(2)(i) of this section. In general, a separately identified account is an account established under the taxpayer's name and taxpayer identification number with a depository institution. For purposes of paragraph (c)(2)(i) of this section, a sub-account will be treated as a separately identified account if the master account under which the sub-account is created is established with a depository institution, the depository institution identifies the sub-account by the taxpayer's name and taxpayer identification number, and the depository institution specifically credits earnings to the sub-account.

[10]    *See* Treas. Reg. § 1.1031(k)-1(g)(4)(i). The language of this section says that the "determination of whether the taxpayer is in actual or constructive receipt of money or other property before the taxpayer actually receives like-kind replacement property is made as if the qualified intermediary is not the agent of the taxpayer." This suggests that the intent of the Internal Revenue Service is to treat the funds as NOT those of the taxpayer.

"Relinquished Properties").   The net sale proceeds from the sale of Millard's Relinquished

Properties (the "Exchange Funds") were transferred by the closing agents directly to the LES

master account at Citibank.  The Exchange Funds were then moved from the master account into

the separate sub-accounts, i.e. the Segregated Accounts, associated with Millard's name and

Millard's taxpayer identification number.   The Exchange Funds were never held in the

Commingled Account.  The Segregated Accounts were in the name of and were controlled by

LES.  Only LES had the ability to direct the disbursement or withdrawal of the Exchange Funds.

LES was the only signatory on the Segregated Accounts.   Only LES had direct control of

movement within or between the master account and the sub-accounts.  The parties agreed in the

Exchange Agreements that LES could earn interest or other fees on the Exchange Funds through

its maintenance of the master account and the Segregated Accounts.

Section 2 of each of the Exchange Agreements provides in pertinent part:

(c)  Subject to the investment protocol described in Paragraph 3 below, LES shall have sole and exclusive possession, dominion, control and use of all Exchange Funds, including interest, if any, earned on the Exchange Funds. . . .  This agreement i) expressly limits the Taxpayer's[11] rights to receive, pledge, borrow or otherwise obtain the benefits of money or other property held by the qualified intermediary. . . .  Taxpayer shall have no right, title, or interest in or to the Exchange Funds or any earnings thereon and Taxpayer shall have no right, power, or option to demand, call for, receive, pledge, borrow or otherwise obtain the benefits of any of the Exchange Funds. . . .

Section 3 of each of the Exchange Agreements (to which Section 2 was expressly subject)

requires LES to place the Exchange Funds in Segregated Accounts.   It further provides that all

earnings on the Exchange Funds were payable to Millard.[12]  Section 3 does not restrict the ability

---

[11]  Under the terms of the Exchange Agreements, Millard is defined as "Taxpayer."

[12]  Millard argues that the use of an apostrophe "s" in the phrase "Taxpayer's Exchange Funds," as that phrase is used in Section 3 of the Exchange Agreements, connotes that the funds in the Segregated Accounts belong to Millard, the taxpayer.  But this forced interpretation of Section 3 proves too much.  If the Court were to adopt this interpretation, then more than just the beneficial interest in the Exchange Funds would remain with the taxpayer and the transaction would not pass IRS regulatory scrutiny for a 1031 Exchange.  This forced interpretation would also

of LES to pledge, encumber, borrow, or otherwise receive the benefits of the Exchange Funds placed in the Segregated Accounts.  Section 4 of each of the Exchange Agreements sets forth the procedures for Millard to identify the Replacement Property.  Section 5 of each of the Exchange Agreements sets forth the terms under which LES will acquire the Replacement Property and transfer it to Millard.  Section 6 of each of the Exchange Agreements makes clear that the sole purpose of the Exchange Agreements is to facilitate Millard's exchange of the Relinquished Properties for the Replacement Properties.  Section 6(c) of each of the Exchange Agreements expressly limits the duties and obligations of LES.  That section provides:

> LES shall only be obligated to act as an intermediary in accordance with the terms and conditions of this Exchange Agreement and shall not be bound by any other contract or agreement, whether or not LES has knowledge of any such contract or agreement or of its terms or conditions.  LES has undertaken to perform only such duties as are expressly set forth herein, and no additional duties or obligations shall be implied hereunder or by operation of law or otherwise.

Each of the Exchange Agreements contains an integration (or merger) clause in Section 11 providing that "[t]his Exchange Agreement contains the entire understanding between and among the parties hereto."

### Standard for Entry of Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure, made applicable to these proceedings by Rule 7056 of the Federal Rules of Bankruptcy Procedure, provides that summary judgment should be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 327 (1986).  In determining whether this showing has been made, the court must assess

---

require the Court to ignore completely the unambiguous language in Section 2 that LES shall have sole and exclusive possession, dominion, control and use of the Exchange Funds and that Millard shall have no right, title, or interest in or to the Exchange Funds.  If the alternate interpretation that Millard now advances was truly what the parties intended, there were better ways to evidence that intent than through the use of an apostrophe "s" in an isolated phrase contained in Section 3 of the parties' Exchange Agreement.

the evidence in the light most favorable to the party opposing the motion.   *See, e.g.*,
*Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979).

The United States Supreme Court has made clear that summary judgment is not a
disfavored procedural shortcut, but rather an integral part of the Federal Rules, which are
designed "to secure the just, speedy and inexpensive determination of every action."   *Celotex
Corp. v. Catrett,* 477 U.S. at 32. (quoting Fed. R. Civ. P. 1); s*ee also Thompson Everett, Inc. v.
Nat'l Cable Adver., L.P.*, 57 F.3d 1317, 1322–23 (4th Cir. 1995); *Sibley v. Lutheran Hosp. of
Md., Inc.,* 871 F.2d 479, 483 n.9 (4th Cir. 1989); *Schultz v. Wills (In re Wills),* 126 B.R. 489, 494
(Bankr. E.D. Va. 1991).

A party moving for summary judgment bears the initial burden of demonstrating that
there is no genuine issue of material fact.   *See Celotex Corp. v. Catrett,* 477 U.S. at 322.
Summary judgment is appropriate only where there are no "disputes over facts that might affect
the outcome of the suit;" disputes over mere peripheral or irrelevant facts are not sufficient.
*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

If the moving party demonstrates that there is no genuine issue of material fact, the
burden shifts to the nonmoving party to produce evidence to demonstrate that there is indeed a
genuine issue for trial.   Fed. R. Civ. P. 56(e)(2) ("When a motion for summary judgment is
properly made and supported, an opposing party may not rely merely on allegations or denials in
its own pleading; rather, its response must—by affidavits or as otherwise provided in this rule—
set out specific facts showing a genuine issue for trial.  If the opposing party does not so respond,
summary judgment should, if appropriate, be entered against that party."); *see also Celotex Corp.
v. Catrett,* 477 U.S. at 325; *RGI, Inc. v. Unified Indus., Inc.*, 963 F.2d 658 (4th Cir. 1992).

The parties all assert that summary judgment is appropriate in this case because there is
no dispute as to any material fact regarding the subject transactions.  Resolution of the matters in

11

dispute involves the interpretation of three substantially similar contracts, none of which is ambiguous.[13]  Furthermore, as all of the parties have filed motions for summary judgment, no party can be heard to complain that it will be deprived of a right to trial if summary judgment is entered.

## Discussion

Section 541 of the Bankruptcy Code provides for the creation of a bankruptcy estate upon the filing of a bankruptcy petition.[14]  Property included within that estate is defined very broadly to include every interest that a debtor has in property as of the commencement of the bankruptcy case, wherever located and by whomever held.  *United States v. Whiting Pools, Inc.,* 462 U.S. 198, 204-05 (1983) ("The House and Senate Reports on the Bankruptcy Code indicate that § 541(a)(1)'s scope is broad."); *Grochal v. Ocean Tech. Servs. Corp. (In re Baltimore Marine Indus.),* 476 F.3d 238, 240 (4th Cir. 2007) ("Section 541 of the Bankruptcy Code governs the composition of the bankruptcy estate and provides a broad definition of 'property of the estate.'").

In line with the broad definition of "property of the estate," money held in a bank account in the name of a debtor is presumed to be property of the bankruptcy estate.  *See, e.g., In re Amdura Corp.,* 75 F.3d 1447, 1451 (10th Cir. 1996) ("We presume that deposits in a bank to the credit of a bankruptcy debtor belong to the entity in whose name the account is established."); *Boyer v. Carlton, Fields, Ward, Emmanuel, Smith & Cutler, P.A. (In re U.S.A. Diversified*

---

[13]  It is important to determine whether the contracts are ambiguous, since "[i]f a court properly determines that the contract is unambiguous on the dispositive issue, it may then properly interpret the contract as a matter of law and grant summary judgment because no interpretive facts are in genuine issue."  *Washington Metro. Area Transit Auth. v. Potomac Inv. Props., Inc.,* 476 F.3d 231, 235 (4th Cir. 2007).

[14]  Section 541 of the Bankruptcy Code provides in pertinent part:
    (a)  The commencement of a case under section 301, 302, or 303 of this title creates an estate. Such estate is comprised of all the following property, wherever located and by whomever held:
        (1) Except as provided in subsections (b) and (c)(2) of this section, all legal or equitable interests of the debtor in property as of the commencement of the case.

*Prods., Inc.*), 100 F.3d 53, 55 (7th Cir. 1996) ("Property of the debtor is defined to include all legal or equitable interests of the debtor . . . and obviously that includes the interest that a depositor has in the money in his account, more precisely the money owed him by the bank by virtue of the account.") (internal quotations omitted); *Asurion Ins. Servs., Inc. v. Amp'd Mobile, Inc.* (*In re Amp'd Mobile, Inc.*), 377 B.R. 478, 483 (Bankr. D. Del. 2007) ("Property held by a debtor is presumed to be property of the estate."); *Sousa v. Bank of Newport*, 170 B.R. 492, 494 (D.R.I. 1994) (the bankruptcy estate "includes funds held in a checking or savings account"); *Stratton v. Equitable Bank*, N.A., 104 B.R. 713, 726 (D. Md. 1989) (funds deposited in an account owned and controlled by the debtor become the debtor's property).[15]

In this case, the facts mandate a presumption that the Exchange Funds are the property of the LES bankruptcy estate. The Exchange Funds were derived from the proceeds of the sale of the Relinquished Properties that Millard had assigned to LES. The Exchange Funds were transferred from the third party purchasers of these Relinquished Properties directly into the bank account of LES by the closing agents. The transferred funds remained in the bank accounts of LES through the Petition Date. Millard never had any ability to withdraw the funds. The accounts were under the complete control of LES. Only LES had the ability to disburse or withdraw the funds. As LES maintained the exchange funds in bank accounts in its name and under its control, the money is presumably property of the LES bankruptcy estate. *Boyer v. Carlton, Fields, Ward, Emmanuel, Smith & Cutler, P.A. (In re USA Diversified Products, Inc.)*, 100 F.3d 53, 55 (7th Cir. 1996) (estate property "includes the interest that a depositor has in the money in its account"); *Elsaesser v. Gale* (*In re Salt Lake City R.V., Inc.),* No. 95-03264-7, 1999

---

[15]  *See Collier on Bankruptcy* ¶ 541.09 (Alan N. Resnick & Henry J. Sommer, eds., 15th ed. Rev. 2008) ("deposits in the debtor's bank account become property of the estate under § 541(a)(1)").

WL 33486709, at *4 (Bankr. D. Idaho, March 17, 1999) ("[m]oney in a bank account under the debtor's control presumptively constitutes property of the debtor's estate. . . .").

To rebut this presumption that the funds are property of the bankruptcy estate of LES, Millard must show that it retained some right to the funds.  Any such right to the funds must be established as an interest in property recognized under state law.[16]  *Butner v. United States*, 440 U.S. 48, 55 (1979).  Millard contends that LES was temporarily holding the Exchange Funds on its behalf solely for the purpose of facilitating the exchange of the Relinquished Properties for the Replacement Properties.  Millard maintains that it never parted with its equitable interest in the ownership of the Exchange Funds[17] and that LES was holding the Exchange Funds in trust for Millard's benefit.  Therefore, it asserts, although the Exchange Funds may have been held in the bank accounts of LES, they did not become property of the LES bankruptcy estate.  11 U.S.C. § 541(d).[18]  Millard points to the fact that under the Exchange Agreements LES was required to place the Exchange Funds in segregated sub-accounts associated with Millard's name and taxpayer identification number.[19]  Millard also points to the fact that nothing in the Exchange

---

[16]   One of Millard's alternative arguments is that LES was acting as a mere conduit for its Exchange Funds; and, as such, the funds are excluded from the LES bankruptcy estate pursuant to § 541(d) of the Bankruptcy Code as a matter of federal common law.  In support, it cites *City of Springfield, Mass. v. Ostrander (In re LAN Tamers),* 329 F.3d 204 (1st Cir. 2003); *T&B Scottdale Contractors, Inc. v. United* States, 866 F.2d 1372 (11th Cir. 1989).  In those cases cited by Millard in support of this position, the funds originated from a Federal program and were earmarked for a specific statutory purpose.  That is not the case here where the Exchange Funds represent the net proceeds of third party purchasers' acquisitions of Relinquished Properties.

[17]   Legal title to property and the equitable interest in property are separate property interests.  *See, e.g., In re Halabi*, 184 F.3d 1335, 1337 (11th Cir. 1999).

[18]   Section 541(d) of the Bankruptcy Code creates a limitation on the otherwise broad definition of property of the estate.  That section provides in pertinent part that:
> "property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest . . . becomes property of the estate under sub-section (a)(1) or (2) of this section only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold."

[19]   Nothing in the Exchange Agreements, however, prohibited LES from investing the Exchange Funds that were placed into the Segregated Accounts (indeed LES was indemnified in the event it chose not to do so), from transferring the Exchange Funds out of the Segregated Accounts, from encumbering or pledging the Segregated Accounts for its own use, or from otherwise obtaining the benefits of the Exchange Funds.  In fact, the funds in the

Agreements imposes on LES any risk of loss commonly associated with ownership.  These facts, together with the fact that Millard retained the benefits of accrued interest, are strong indicia, Millard argues, that it never parted with its equitable ownership interest in the Exchange Funds. Millard concludes, therefore, that LES holds the funds in trust for its benefit.

Whether property in the possession of the Debtor is held in trust for Millard is a question of state law.  *Butner*, 440 U.S. at 55.  While federal law creates the bankruptcy estate, state law defines the scope and existence of the debtor's interest in property.  *Raleigh v. Ill. Dept. of Revenue*, 530 U.S. 15, 20 (2000) ("The 'basic federal rule' in bankruptcy is that state law governs the substance of claims, Congress having 'generally left the determination of property rights in the assets of the bankrupt's estate to state law.'") (quoting *Butner* 440 U.S. at 57).  LES and Millard agreed that the Exchange Agreements would be governed by Virginia law.[20]  That contractual choice of law provision is determinative of the law to be applied in this case.  *See Holmes Envtl., Inc. v. SunTrust Banks, Inc. (In re Holmes Envtl., Inc.),* 287 B.R. 363, 374 (Bankr. E.D. Va. 2002) (*citing Tate v. Hain,* 180 Va. 402, 410, 25 S.E.2d 321, 324 (Va. 1943)).

Under the terms of the Court's February 10, 2009, order, the question to be resolved at this stage of the litigation is whether the Exchange Funds are excluded from property of LES' bankruptcy estate because of the existence of either an express trust or a resulting trust.  The Court will look to the law of the Commonwealth of Virginia for its analysis of these two issues.  Millard bears the burden of proving the existence of a trust.  *See Page v. Page*, 132 Va. 63, 110 S.E. 370, 372 (1922) (party seeking to establish a trust has the burden of proving its existence); *Chiasson v. J. Louis Matherne & Assocs. (In re Oxford Mgmt., Inc.),* 4 F.3d 1329, 1335 (5th Cir. 1993)

---

Segregated Accounts were entirely and completely vulnerable to attachment and levy by third party creditors of LES.

[20]  Section 11 of the Exchange Agreements provides that "[t]his Exchange Agreement shall be governed by and construed in accordance with the applicable laws of the Commonwealth of Virginia without regard to the conflict of laws provisions thereof . . . ."

("When the property of an estate is alleged to be held in trust, the burden of establishing the trust's existence rests with the claimants.").

Under Virginia law, an express trust is created only where there is "an affirmative intention to create it." *Peal v. Luther*, 199 Va. 35, 37, 97 S.E.2d 668, 669 (1957); *Leonard v. Counts,* 221 Va. 582, 588, 272 S.E.2d 190, 194 (1980) (an express trust is "based on the declared intention of the trustor."). The affirmative intention to create a trust may be established by "either express language to that effect or circumstances which show with reasonable certainty that a trust was intended to be created." *Woods v. Stull*, 182 Va. 888, 902, 30 S.E.2d 675, 682 (1944); *Rivera v. Nedrich*, 259 Va. 1, 6, 529 S.E.2d 310, 312 (1999).

There is no express language in the Exchange Agreements that creates a trust. The words "trust," "trustee," or "beneficiary" do not appear anywhere in the Exchange Agreements. Given the omission of any language normally associated with the creation of a trust, Millard must demonstrate with "reasonable certainty" circumstances that show both parties to the Exchange Agreement nevertheless intended to create a trust. *Woods v. Stull*, 182 Va. at 902, 30 S.E.2d at 682.

The Court thus turns to an examination of whether Millard has demonstrated the parties' intent to create a trust despite the absence of express language to do so. Although formal or technical words are not necessary to create a trust, the fact that the Exchange Agreements make no mention of a "trust" is significant in determining whether a trust was intended. *See In re Estate of Vallery*, 883 P.2d 24, 27 (Colo. App. 1993). Here, not only is there an absence of any language that the parties intended to create a trust, but there is language in the Exchange Agreements that actually evidences an intent *not* to do so. Millard, in the Exchange Agreements,

16

conveyed exclusive possession, dominion,[21] control and use of the Exchange Funds to LES.  It also disclaimed any right, title or interest in and to the Exchange Funds.  That conveyance combined with that disclaimer is inconsistent with the establishment of a trust.  Under a trustee-beneficiary relationship, the trustee holds legal title in the trust property and the beneficiary holds an equitable interest in the trust property.  *Kubota Tractor Corp. v. Strack*, Case No. 4:06cv145, 2007 WL 517492, at *4 (E.D. Va. Feb. 6, 2007) (citing *Broaddus v. Gresham*, 181 Va. 725, 731, 26 S.E.2d 33, 35 (1943)) (reversed on other grounds, *Kubota Tractor Corp. v. Strack* (*In re Strack*), 524 F.3d 493 (4th Cir. 2008).  However, Millard relinquished *any and all* interests in the property, including the equitable interest that a beneficiary of a trust would retain in trust property.  Millard expressly disclaimed the equitable interest that it now asks this Court to find that it otherwise somehow retained.

Further evidence that the parties did not intend the Exchange Agreements to create a trust can be found in the parties' agreement to limit the duties of LES to those expressly contained in the Exchange Agreements.  A trust necessarily requires the establishment of fiduciary duties.  *See Restatement (3d) of Trusts § 2* (2003) (stating that a trust is a fiduciary relationship with respect to property); *In re NOVA Real Estate Inv. Trust*, 23 B.R. 62, 66 (Bankr. E.D. Va. 1982) ("A trust involves a duty of the fiduciary to deal with particular property for the benefit of another.").[22]  Fiduciary duties create a special relationship of trust and good faith that goes beyond the duties set forth in an ordinary contract between commercial parties.  *See Balbir Brar*

---

[21]  "Dominion" has been defined by one court as "perfect control in right of ownership, and indicates that it was the intention to make the instrument as effectual as a conveyance as it was possible for the parties to make it."  *Baker v. Westcott,* 11 S.W. 157, 159 (Tex. 1889).

[22]  A trustee has a fiduciary obligation to act for the benefit of the trust beneficiary.  *See Continental Cas. Co. v. Powell,* 83 F.2d 652, 654 (4th Cir. 1936) ("There is a fiduciary relation between trustee and beneficiary; there is not a fiduciary relation between debtor and creditor.") (internal citations omitted); *Caldwell v. Hanes* (*In re Hanes*), 214 B.R. 786, 812 (Bankr. E.D. Va. 1997) ("The trustee . . . is a fiduciary of the trust beneficiaries.") (internal citations omitted).

*Ass'n v. Consol. Tracking Servs. Corp.*, At Law No. 137795, 1996 WL 1065615 at *5 (Va. Cir.

Ct. October 1, 1996) (distinguishing between contract duties and fiduciary duties).

The parties to the Exchange Agreements acknowledged that LES was not undertaking

any duties not expressly set forth in the Exchange Agreements (i. e. the contract duties) including

any implied duties or any duties imposed by operation of law.  This limitation on the scope of

LES' duties eliminates any argument that LES had a duty to act as a fiduciary for Millard.

*Metric Constructors, Inc. v. Bank of Tokyo-Mitsubishi, Ltd.*, Case No. 99-2330, 2000 WL

1288317, at *4 (4th Cir. Sept. 13, 2000) (holding that no fiduciary duties existed where the

plaintiff "expressly consented (in the Consent Agreement) to the [defendants'] disclaimer of any

fiduciary relationship toward it").  The Exchange Agreements provide that LES was acting in the

narrow capacity as an exchange facilitator.  The parties agreed that LES assumed no duties not

expressly set forth in the Exchange Agreements including fiduciary duties and none can be

implied or imposed by operation of law.  LES merely had the contractual duty to effect the

exchanges.  The unambiguous language of the Exchange Agreements makes clear that the parties

intended their relationship to be one of contract obligor and obligee.

The Exchange Agreements were integrated contracts.  *See Robinette v. Robinette*, 4 Va.

App. 123, 354 S.E.2d 808, 810 (1987); *see also Lysk v. Criswell (In re Criswell)*, 52 B.R. 184,

197 (Bankr. E.D. Va. 1985) (holding that an integrated agreement containing a merger clause

precluded parties from claiming any reliance on "terms, conditions, statements, warranties, or

representations not contained [in the integrated agreement]").  Millard cannot utilize extrinsic

evidence to modify or alter the contracts' plain statements (i) that Millard had no interest,

including any equitable interest, in or to the Exchange Funds and (ii) that LES owed to Millard

no duty, including any fiduciary duty, not expressly set forth in the Exchange Agreements.

*Robinette v. Robinette*, 4 Va. App. at 128, 354 S.E.2d at 810 (holding that a party cannot

introduce parol evidence to show the existence of a trust if it would defeat or contradict the terms

of an express agreement).   The objective language of the Exchange Agreements precludes

consideration of any subjective belief that the parties may have had regarding the relationship

between them.   *Boone v. U.S. Attorney*, Case No. 7:06VA00006, 2006 WL 1075010, at *3 (W.D.

Va. Apr. 21, 2006) ("Boone may have had a subjective intent to the contrary, but it is the

objective manifestation of intent, as shown by the words used in the agreement, that governs.").[23]

Millard argues that the intent of the parties to create a trust can be gleaned from the

requirement set forth in the Exchange Agreements that the Exchange Funds were required to be

held in segregated sub-accounts, but this argument fails.   The requirement of Segregated

Accounts may provide evidence on the traceability of the funds, but that alone does not create a

trust.

> In order to establish such a right as trust beneficiary, a claimant must make two
> showings:  first the claimant must prove the existence and legal source of a trust
> relationship; second, the claimant must identify the trust fund or property and,
> where the trust fund has been commingled with general property of the bankrupt,
> sufficiently trace the property or funds—the res.

*Conn. Gen. Life Ins. Co. v. Universal Ins. Co.,* 838 F.2d 612, 618 (1st Cir. 1988).   *See also Ellis*

*v. Ellis*, 310 B.R. 762, 764 (Bankr. W.D. Okla. 2004) (holding that agreement to segregate and

not commingle proceeds from the sale of borrower's collateral cannot create a trust in lender's

favor under "fiduciary capacity" exception to discharge under § 523(a)(4)); *Barclay's Amer./*

*Bus. Credit, Inc. v. Long (In re Long),* 44 B.R. 300, 305 (Bankr. D. Minn. 1983) (holding that

"existence of a collateral account, into which proceeds from receivables were to be deposited in

---

[23]  Millard argues that post-contractual conduct is competent to alter or contradict the express terms of an integrated
contract.  However, the cases cited by Millard apply to subsequent parol *agreements* between the parties—not just
the parties' conduct.  *See Piedmont Mt. Airy Guano Co. v. Buchanan*, 146 Va. 617, 131 S.E.793 (1926); *Centex
Constr. v. Acstar Ins. Co.*, 448 F.Supp.2d 697, 712 (E.D. Va., 2006).  No post-execution agreements between LES
and Millard have been alleged in this case.  Furthermore, whether a trust was created is to be determined at the time
of the transfer of the property.

order to segregate the money" did not "create a fiduciary relationship where the substance of the relationship between the parties was that of creditor/debtor"); *cf. Kubota Tractor Corp. v. Strack (In re Strack)*, 524 F.3d 493 (4th Cir. 2008) (holding that proceeds from the sale of collateral were held in trust where the agreement between the parties created an express trust in the sales proceeds).[24]   The fact that the Exchange Funds were required to be placed in segregated sub-accounts provides only half of the equation.   Segregation alone is insufficient to prove the parties' affirmative intention to create an express trust.[25]

Finally, the intention of the parties not to create an express trust can be gleaned from their decision to use the qualified intermediary option from among the four safe harbor options available within the Treasury Regulations.   Qualified intermediaries are not the only means for effectuating like-kind exchange transactions under § 1031.   Treasury Regulation § 1.1031(k)-1(g), which addresses the delivery of funds to third-parties in connection with a 1031 Exchange, provides, in pertinent part, as follows:

> Safe harbors - - (1) In general. Paragraphs (g)(2) through (g)(5) of this section set forth four safe harbors the use of which will result in a determination that the taxpayer is not in actual or constructive receipt of money or other property for purposes of section 1031 and this section. . . .
> (2) Security or guarantee arrangements.
> . . . .
> (3) Qualified escrow accounts and qualified trusts
> . . . .

---

[24]   Millard argues that *Strack* stands for the proposition that a segregation provision in an agreement demonstrates with reasonable certainty the intent to establish an express trust.   However, the plain language of the agreement in *Strack* required the debtor to "hold the same in trust."   *In re Strack*, 524 F.3d, at 495-96.

[25]   The requirement for segregated accounts in the Exchange Agreements reflects the desire of the parties to satisfy one of the safe harbors offered by the Treasury Regulations in order to obtain favorable tax treatment.   It does not, without more, evidence an intention to establish an express trust.   Treasury Regulation section 1.468B-6 requires that any exchange funds exceeding $2 million must be maintained by a qualified intermediary in a separately identified account with all earnings on the account going to the exchanger or in a commingled account with earnings on the account disbursed pro rata to the commingled exchangers.   See Treas. Reg. § 1.468B-6 (2008).   Failure to do so results in treatment of the exchange funds as a loan to the qualified intermediary for tax purposes.   *See id.*   The Exchange Agreements' Segregated Accounts were set up as required in the Treasury Regulations, thus contradicting Millard's argument that the Segregated Accounts were indicative necessarily of an intention to create a trust relationship.

(4) Qualified Intermediaries

. . . .

(5) Interest and Growth Factors

Treas. Reg. § 1.1031(k)-1(g).  These safe harbors are not mutually exclusive.  *See* 26 Treas.

Reg. § 1.1031(k)-1(g)(1) ("More than one safe harbor can be used in the same deferred

exchange, but the terms and conditions of each must be separately satisfied.").  Millard and

LES had the option to utilize a "qualified escrow" or to establish a "qualified trust" pursuant to

subsection (g)(3) of the Treasury Regulation.  The qualified trust option requires a written trust

agreement.   26 C.F.R. § 1.1031(k)-1(g)(iii)(B).   Instead of using either of these available

options, the parties chose the "qualified intermediary" safe harbor.  The Exchange Agreements

specifically state that:   "LES and Taxpayer acknowledge and agree that this Exchange

Agreement is intended to satisfy the safe harbor provisions of Section 1.1031(k)-1(g)(4) of the

Regulations."  Exchange Agreement at ¶6(a).  The parties did not in addition separately satisfy

the terms and conditions of the Treasury Regulations for the creation of either a qualified

escrow or a qualified trust.  As the LES Committee points out in its brief, the parties' decision

to eschew the escrow and trust provisions of the tax code in favor of a different safe harbor

evidences that there was no intention to create a trust relationship.  The Court thus finds that no

express trust was created in any of the three 1031 Exchange transactions at issue.

As the Court has found that the parties to the Exchange Agreements did not intend to

create an express trust, Millard is not now entitled to the imposition of a resulting trust.  In

Virginia a resulting trust is "an indirect trust that arises from the parties' intent or from the

nature of the transaction and does not require an express declaration of trust."  *1924 Leonard

Rd., L.L.C. v. Roekel,* 272 Va. 543, 552, 636 S.E.2d 378, 383 (2006) (citing *Tiller v. Owen,* 243

Va. 176, 180, 413 S.E.2d 51, 53 (1992); *Salyer v. Salyer,* 216 Va. 521, 525, 219 S.E.2d 889, 893

(1975)).  The party seeking to establish such a trust must do so by clear and convincing evidence.

*Id.* (citing *Leonard v. Counts,* 221 Va. 582, 589, 272 S.E.2d 190, 195 (1980)).

"For a resulting trust to arise, the alleged beneficiary must pay for the property, or assume payment of all or part of the purchase money before or at the time of purchase, and have legal title conveyed to another without any mention of a trust in the conveyance." *1924 Leonard Rd.,* 272 Va. at 552, 636 S.E.2d at 383 (citing *Morris v. Morris,* 248 Va. 590, 593, 449 S.E.2d 816, 818 (1994)).  *See also Tiller*, 243 Va. at 180, 413 S.E.2d at 53; *Leonard,* 221 Va. at 588, 572 S.E.2d at 194 (1980).   In *Morris,* the Supreme Court of Virginia quoted its prior opinion in *Kellow v. Bumgardner,* 196 Va. 247, 83 S.E.2d 391 (1954):

> The existence of a resulting trust thus depends upon an equitable presumption of intention, based upon the natural precept that one who advances the purchase money for real property is entitled to its benefits.  Therefore, after it has been shown that payment of all or a part of the purchase price for property has been paid by one person and title thereto has been placed in the name of another, the factor which will determine whether the title is to be impressed with a trust in favor of the payor is the intention of the party providing the purchase money.  If no evidence of intention is available, then the presumed intention will stand; *but if there is evidence that the person who provided the money had some intention other than to secure the benefits for himself, the presumed intention fails and no resulting trust will be recognized.*

*Morris*, 248 Va. at 593, 449 S.E.2d at 818 (quoting *Kellow,* 196 Va. at 255, 83 S.E.2d at 396) (emphasis added).

Millard argues that a trust was found to exist in each of the few reported cases that dealt with like-kind exchange transactions utilizing segregated accounts.[26]  In those cases, the courts were compelled to discern the intent of the parties from the circumstances surrounding their conduct, and the courts imposed resulting trusts.[27]   In none of those cases was it found,

---

[26]  *See Taxel v. Surnow (In re San Diego Realty Exchange, Inc.)*, No. 92-56526, 1994 WL 161646 (9th Cir. May 2, 1994); *Siegel v. Boston (In re Sale Guaranty Corp.)*, 220 B.R. 660 (9th Cir. BAP 1998).

[27]  In *Cook v. 1031 Exch. Corp.*, At Law No. 116304, 1992 WL 885015 (Va. Cir. Ct. Nov. 12, 1992), another case upon which Millard relies, the court found that the parties stipulated that the funds were held in trust.

however, that the parties had entered into a fully integrated agreement that evidenced an intention not to create a trust.  In this case, the parties' intentions are readily discernible from the Exchange Agreements themselves.  The Court need not divine the intent of the parties from the surrounding circumstances.  Millard and LES were each experienced, sophisticated parties to complex documented commercial transactions.  They were separately represented by capable counsel and experienced financial professionals.[28]  If the parties had wanted to create a trust, they certainly were capable of doing so.  They did not.  A resulting trust cannot be imposed in the face of Exchange Agreements that demonstrate clearly a contrary intent.  The Court thus finds that no resulting trust was created in any of the three 1031 Exchange transactions at issue.  This result obtains without regard to the considerable hurdle that Millard would otherwise have to overcome that a resulting trust must be established through clear and convincing evidence.

## Conclusion

The Exchange Funds are not excluded from property of the estate pursuant to 11 U.S.C. § 541(d) because of the existence of an express trust or as a result of the imposition of a resulting trust.  The plain, unambiguous language of the Exchange Agreements clearly establishes that it was not the intent of LES or Millard to create an express trust.  As the Exchange Agreements were integrated contracts, Millard cannot use parol evidence to prove the existence of an express trust.  Given the parties' clear intent in the Exchange Agreements not to create an express trust, it is inappropriate for the court to impose a resulting trust upon them.  This is especially the case where the parties are sophisticated, as they are here, and

---

[28] Consistent therewith, Section 11 of the Exchange Agreements provides that:  "Each party hereto and their legal counsel have reviewed this Exchange Agreement and have had an opportunity to revise (or request revision of) this Exchange Agreement and, therefore, any usual rules of construction requiring that ambiguities are to be resolved against a particular party shall not be applicable in the construction and interpretation of this Exchange Agreement."

where the parties have included a merger clause in their agreement.  Therefore, the Court will

deny Millard's motion for partial summary judgment and grant partial summary judgment in

favor of the Committees against Millard.  The Court will dismiss Millard's requested relief for

declaratory judgment and injunctive relief as set forth in Counts I and II of its Complaint.  A

separate order shall issue.


ENTERED:  _____


_____ /s/ Kevin R. Huennekens_____
UNITED STATES BANKRUPTCY JUDGE


Copies to:

Lawrence O. Kamin
Terence K. McLaughlin
Elizabeth J. Bower
Willkie Farr & Gallagher, LLP
787 Seventh Avenue
New York, NY  10019

Dion W. Hayes
John H. Maddock, III
McGuireWoods LLP
One James Center
901 East Cary Street
Richmond, VA  23219

Craig A. Wolfe
Robert S. Friedman
Eric B. Post
Kelley Drye & Warren LLP
101 Park Avenue
New York, NY  10178-0002

David J. Ervin
Kelley Drye & Warren LLP
Washington Harbor, Suite 400
3050 K Street, NW
Washington, DC  20007-5108

Bruce H. Matson
Christopher L. Perkins
LeClair Ryan, A Professional Corporation
Riverfront Plaza, East Tower
951 East Byrd Street, Eighth Floor
Richmond, VA  23219

Jeffrey S. Sabin
Mark M. Elliott
Justin G. Imperato
Bingham McCutchen LLP
399 Park Avenue
New York, NY  10022

Charles R. Gibbs
Keefe Bernstein
Sarah Link Schultz
Akin Gump Strauss Hauer & Feld LLP
1700 Pacific Avenue, Suite 4100
Dallas, TX  75201

Mary A. House
Akin Gump Strauss Hauer & Feld LLP
1333 New Hampshire Avenue, NW
Washington, DC  20036

Lynn Tavenner
Paula S. Beran
Tavenner & Beran., PLC
20 North Eighth Street, Second Floor
Richmond, VA  23219

Robert B. VanArsdale
Assistant U. S. Trustee
701 East Broad Street, Suite 4304
Richmond, VA  23219